UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

THERESA KACZKOWSKI, :

Plaintiff, :

-against- :

CAROLYN COLVIN, :

Defendant. :
---------------------------------------------------------------x

OPINION AND ORDER
15 Civ. 9356 (GWG)

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiff Theresa Ruth Kaczkowski brings this action under 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying her claim for social security income and disability insurance benefits under the Social Security Act. Both Kaczkowski and the Commissioner have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).[1] For the reasons stated below, the Commissioner's motion is denied and Kaczkowski's motion is granted.

## I. BACKGROUND

### A. Kaczkowski's Claim for Benefits and Procedural History

Kaczkowski completed an application for disability insurance benefits on January 3, 2013. See Administrative Record, filed Feb. 1, 2016 (Docket # 8) ("R."), at 160. The Social

---

[1] See Notice of Motion, filed Apr. 8, 2016 (Docket # 12); Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings Under Rule 12(c) Fed. R. Civ. P., filed Apr. 8, 2016 (Docket # 13) ("P. Mem."); Notice of Motion, filed June 27, 2016 (Docket # 17); Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed June 27, 2016 (Docket # 18) ("D. Mem."); Plaintiff's Reply Memorandum of Law in Support of Motion for Judgment on the Pleadings Under Rule 12(c) Fed. R. Civ. P., filed July 18, 2016 (Docket # 19) ("Reply").

Security Administration initially denied the application on June 13, 2013. R. 86-102. Kaczkowski requested a hearing before an administrative law judge ("ALJ"), which occurred on April 17, 2014, before ALJ Vincent M. Cascio. See R. 48-85. Kaczkowski was represented at the hearing by an attorney. See R. 52. The ALJ issued his written decision denying Kaczkowski's application on July 18, 2014. See R. 26-42. Kaczkowski, through her counsel, requested review of the ALJ's decision by the Appeals Council. See R. 6-22. The Appeals Council denied her request on October 14, 2015. R. 1-3. Represented by different counsel, Kaczkowski filed this action on November 30, 2015. See Complaint, filed Nov. 30, 2015 (Docket # 1).

B. Medical Evidence

Kaczkowski and the Commissioner have each provided a summary of the medical evidence contained in the administrative record. See P. Mem. at 1-16; D. Mem. at 2-17. The Court adopts the parties' summaries together as accurate and complete for purposes of the issues raised in this suit. We discuss the medical evidence pertinent to the adjudication of this case in section III below.

C. The Hearing before the ALJ

Kaczkowski appeared at a hearing before an ALJ on April 17, 2014. R. 50. Kaczkowski was represented by James Chisholm, an attorney from the law firm of Kirk & Teff. R. 52. Mr. Chisholm gave an opening statement articulating the basis of Kaczkowski's claim for disability benefits, including "multiple conditions involving her back and spine," a diagnosis of Ehlers-Danlos Syndrome ("EDS"), and "a depression or anxiety disorder." R. 53.

The ALJ then began examining Kaczkowski. R. 55. She was born on October 7, 1964, making her 49 years old at the time of the hearing. Id. She is approximately five feet, five-and-

a-half inches tall, and weighed approximately 148 pounds. Id. She is divorced and has one child, a son who was 28 years old on the hearing date. Id. She and her son lived together. R. 56. Her son was employed at the time of the hearing. Id.

Kaczkowski had a driver's license. Id. She did not drive much. Id. She drove to the college where she was taking courses, a distance of "about 4.3 miles," and "sometimes" drove as far as 22 miles. Id. She "[o]ccasionally" drove to visit her mother, which was "about 55 miles," but such trips required her to "stop and take a break," to "bring ice packs with [her] in the car," and to "have . . . cushions." Id. Kaczkowski's mother drove her to the hearing. Id.

When asked about her college studies, Kaczkowski stated that she started "after [she] got hurt . . . because [she] knew that [she] wasn't going to be able to do that job forever." R. 57. She started taking courses with an Empire State College online program, "most of [which] were online," but "[s]ometimes, [she] had to go in." Id. The course she was taking at the time of the hearing was "online." Id. She was also taking "math courses," and "tried tutoring since [she] was good at math and [she] could set [her] own hours." Id. Her course of studies was for a bachelor's in "health services," see id., but her "original plan was just to get a bachelor's of any kind," R. 58 (internal punctuation omitted). Kaczkowski reported taking one course in "[m]anaged care . . . through Empire for my bachelor[']s" and "mathematics for elementary school teachers . . . to help with my tutoring." Id. She was taking the mathematics course through "Dutchess Community College." Id. She went to Dutchess twice a week for the mathematics course. See id. Kaczkowski reported needing "six more credits" to get her bachelor's degree. Id.

Kaczkowski was tutoring college-aged students in pre-calculus for approximately four hours per week, making eight dollars an hour. R. 59. She had been tutoring regularly since

November 2013, and had started "a little bit before that" on a more informal basis. See id.

The last time Kaczkowski worked full time was January 10, 2011, when she was a "radiology technologist." R. 60. She had been working as a radiology technologist since 1990. Id. Kaczkowski stopped working because she "had severe leg pain and [she] couldn't barely even walk anymore." Id. She also reported "upper back" pain which was "constant . . . 24/7." Id. The back pain "exacerbated the whole thing besides both leg pains." R. 61. Kaczkowski reported being excused from work on January 10, 2011, and later being diagnosed with EDS. See R. 60-61.

Kaczkowski testified that she "was on worker[']s comp" and "g[o]t unemployment," because she "was going to just try to find a part-time job." R. 61. She reported not being able to find work that did not require her to "either . . . sit all day or stand all day or lift." Id. She received unemployment for "[a]bout a year." See R. 61-62. She also testified that "they're trying to settle" her worker's compensation case, which is based on her "upper lower back and [her] neck." R. 62.

Kaczkowski recounted her history of EDS symptoms, which included multiple instances of her arm dislocating when she was younger. R. 62-63. EDS gave her "knee pains [and] hip pains," and caused her joints to "slip." R. 63 (internal punctuation omitted). She illustrated, saying, "[i]f I pick something up with my wrist, I can feel my wrist slipping." Id. She also reported not being able to "do walking much" because of a "sharp pain in [her] foot," and because "something is wrong with my hips that affects my knee and it goes down to my lower leg cramping, and then it hurts my back, so they think that's from the [EDS]." Id.

Kaczkowski related that she suffered from "rib pain" for "four years . . . constant every day," which she said "could be from the [EDS], but maybe in combination with my lifting

constantly and pulling my upper back out several times at work." Id. She referred to a temporomandibular joint disorder, which she indicated might be related to her EDS. R. 64. She referred to "constant headaches," "pain in [her] jaw" when she "do[es]n't wear [her] mouthpiece," and "always hav[ing] a slight pain in [her] right side." Id.

Kaczkowski then turned to her back injuries. She said that she "pulled [her] back out within two years of [her] career," but it "didn't herniate"; the injury was a "severe lumbar sprain," which left her "bedridden." Id. She then was "good for a while," except for her "upper back pain and knee pain" and EDS, but then she "started getting worse" and "was incapacitated a couple times." Id. She used a "back brace," "ice packs," and "some pain killers." Id. Kaczkowski recalled a specific incident where she was lifting a patient at her job and "felt something right in [her] left buttocks . . . that was [her] herniated disc," then "couldn't lift [her] leg up," and experienced "numbing [and] severe pain." R. 64-65 (internal punctuation omitted).

Kaczkowski got injections to treat her back pain on at least two occasions. See R. 65. After one injection, she testified that her "leg was dragging around," which caused her "hips [to] start[] hurting," which led to "the surgery." Id. After the surgery, she "didn't go back to work for . . . about three months, because [she] was having pains" that she had not experienced after a prior surgery. Id. Kaczkowski reported "still gett[ing] them sometimes now if I do too much sitting or standing." Id. She testified that she went back to work until she "injured [her] back again in June of '07," id., and that she "pulled out [her] upper back really bad" in 2009, which was when she "started getting pain down in [her] arm," R. 66. She thought she "had a shot in [her] neck" before "June," which "helped the pain in [her] arm, but then . . . a few months later, [her] ribs started hurting all the time." Id.

Kaczkowski said that for "[f]our years now," she had "constant ri[b] pain and the upper

back, and then it goes down my arm. If I use my arms, I get the pain down here and burning in this elbow." Id. During her "last two years of work," she described "go[ing] out in [her] car and lay[ing] down at lunchtime," or going "into the bathroom and la[ying] on the floor." R. 66-67.

The ALJ asked Kaczkowski about her breast cancer. R. 67. She testified that her breast cancer deepened her depression. Id. However, aside from "stiff[ness]," id., she felt few symptoms relating to her breast cancer and said it was "the least of [her] problems," R. 68.

The ALJ reviewed Kaczkowski's medications, which at the time included Tamoxifen, Celebrex, Oxycodone, Zoloft, Lamictal, Lotaire gel, Baclofen, Cyclobenzaprine, and diazepam. See R. 68. Kaczkowski testified that some of her medications made her feel drowsy "sometimes." R. 69.

The ALJ turned to Kaczkowski's "psychological issues." Id. Kaczkowski testified that she suffered from "major depression," elaborating that she "had depression a lot through my life," which worsened "since not having a job." Id. She related that she suffers from "crying spell[s]." Id. She described an incident when she "was hospitalized" in 2013 after telling a friend that she "didn't want to live," although Kaczkowski "didn't say [she] was going to kill [her]self." Id.

The ALJ asked if she had "problems with [her] attention and concentration." Id. She replied "[y]eah," and explained that she was "very nervous, when [she is] trying to read," and she "ha[s] to keep reading it over and over because [she] keep[s] drifting off." Id. "[O]ther times," she "can do it"; she noted that she was "passing [her] courses, but it's not easy." R. 69-70.

When asked about her "ability to get along with people," Kaczkowski said that she got along with others, "for the most part." R. 70. She indicated that she had "been told . . . that

[she] was . . . friendly," but she "get[s] all internalized when people are nasty" and "sometimes go[es] into a depression." Id. She also described problems at her "last job," where it seemed that "they didn't seem to like [her] that much," especially "some of the management." Id.

Kaczkowski stated that she could not walk "very far" because of her "hip problem." R. 71. She could walk "in the parking lot to the store," but once in the store, she "hold[s] onto the cart. . . . [She] do[es]n't walk around the store . . . without a cart," generally because her "knees start hurting, [her] hip starts hurting, and it goes into [her] back." Id. She guessed that she could "probably walk two blocks" before she would need to "sit down or hold onto something." Id.

Kaczkowski had problems sitting for longer than "a few minutes"; she "constantly mov[ed] around" or "lean[ed] back" while sitting. See R. 72. Any "repetitive work . . . like on the computer" would be "really bothersome." Id. (internal punctuation omitted).

She said that "standing in one spot is very difficult," and that she "start[s] feeling [her] back start[] to tighten" after "a couple minutes." Id. When that happens, she "shift[s] [her] weight . . . back and forth" and generally "avoid[s] standing in one spot." Id.

The ALJ asked Kaczkowski about the "heaviest thing that [she]'d be able to lift or carry," to which she replied, "[p]robably, like, up to 10 pounds, but definitely no more than 10. And [she] wouldn't want to do that too often." R. 73. She testified that she was capable of lifting her arms above her head, but she "tr[ies] not to," because it would make her "upper back and rib cage hurt[]." Id.

Kaczkowski testified that she was able to pick up small items but she "g[o]t cramping in [her] forearms." Id. If she did not change positions frequently, "the stump hurt[]" and she could not "type very long because of the wrist and forearms." Id. She reported taking breaks when she had to type. Id.

The ALJ asked Kaczkowski about her activities of daily living. See R. 74. She reported that she was able to shower, dress and cook for herself. See id. She stated that she "really [did not] clean that much" but that she would "do the dishes . . . wash the sinks and stuff." Id. She said that she would "clean the toilets once in a while or something" but that to do so, she would squat, "get[ting] all the way down on the floor so that [she was not] bending; [her] back [was] straight." Id. She said she did the laundry with her son's help, which included "hang[ing] it" to dry. R. 75. She emphasized that she "do[es] everything slow." Id. Kaczkowski testified to shopping on her own. Id.

Turning to her social life, Kaczkowski went to church unless she was "not feeling well." Id. She went out with friends "occasionally." See R. 76. She reported watching television, listening to the radio, and occasionally using the computer. See id.

During questioning by her attorney, Kaczkowski indicated that she had done "[l]ots of physical therapy. . . . [A]lmost on everything: [her] neck, [her] upper back, [her] lower back, knees, hips, wrist, and . . . elbow." R. 77. She could not recall the chronology of her physical therapy, but had gone for different body parts at different times since she stopped working. See id. She had also undergone occupational therapy. See R. 78. She testified that these therapies did not provide any relief, and it actually made one of her shoulders and one of her hips "worse." Id.

Kaczkowski had one injection "recently" in her shoulder and it "didn't help a little bit, but it's still painful." Id. When she lay on her shoulder, her neck hurt, and when she woke up in the morning she had "very bad neck stiffness"; her neck would "get caught when [she] tr[ied] to turn her head." Id. She had also had a neck injection which she thought was in "June of [20]11." R. 78-79. That injection "helped the pain," but she was "getting that [pain] back again

if [she] use[d] [her] arm too much." R. 79.

Kaczkowski testified to having trouble sleeping, in part because her shoulder pain would "wak[e] [her] up." Id. She reported pain when lying on her side, causing her to switch sides during the night. Id. Kaczkowski testified that if she did not get eight hours of sleep, her "vertigo acts up," manifesting in "dizziness." Id. She thought she got "eight hours" of sleep a night, "most of the time." Id.

Kaczkowski reported needing to lay down "[s]everal times a day" because of pain in her "upper back and ribs." R. 80. She would generally lay down for "[a]bout a half hour" before rising again. Id. When attending classes, she reported going to the library, where there was a chair where she could "kind of sit back" like she was sitting at the hearing. Id.

Kaczkowski noted that her doctors at Orthopedic Associates had told her that, given her history with shoulder surgery, there was "probably nothing to be done about" her shoulder dislocating while she slept. R. 81.

The ALJ asked if Kaczkowski did "any other activities," like "hobbies or trying to do . . . more types of exercise." R. 82. She stated that her "doctor told [her] that [she] could ride a bike," and she "can do that, but . . . can't do it very long because [she] can't sit that long." Id. She would "ride a little and walk and sit down and take a break," but that had become more difficult because she "can't take a walk any more." Id. She had problems lifting the bicycle onto a rack mounted on her car. See id. Mr. Chisholm asked Kaczkowski when she last rode a bicycle. R. 83. She said that she thought she "rode it last year." Id. However, she noted that her ability to walk had deteriorated since then. See id. She noted that she "rode [a] stationary [bicycle] at the physical therapy." Id.

D. The ALJ's Decision

The ALJ issued his decision on July 18, 2014. See R. 42. The ALJ found that Kaczkowski met "the insured status requirements of the Social Security Act through December 31, 2016." R. 28. He found that Kaczkowski "ha[d] not engaged in substantial gainful activity since January 10, 2011, the alleged onset date." Id. He noted that even though Kaczkowski had worked during this time, her "work activity did not rise to the level of substantial gainful activity." Id. He also noted that Kaczkowski "received unemployment benefits between the first and fourth quarters of 2012." Id.

The ALJ listed a number of "severe impairments" afflicting Kaczkowski:

> Ehler-Danlos Syndrome, type III ("EDS"); status post partial mastectomy at right breast secondary to invasive ductal carcinoma; cervical and lumbar radiculopathy; multi-level thoracic spine degenerative disc disease; cervical spine degenerative disc disease; lumbar spine spondylosis at L2-L3 and L4-L5, status post microdiscectomy with recurrent disc herniation at L3-4; left peroneal neuropathy; major depression; mood disorder, NOS; panic disorder without agoraphobia; personality disorder; and pain disorder associated with general medical condition (20 CFR 404.1520(c)).

Id. However, the ALJ found that Kaczkowski "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 4041526)." R. 29.

The ALJ noted that he gave "[s]pecific consideration . . . to the applicable sections of 1.00 Musculoskeletal System, 11.00 Neurological, 12.00 Mental Disorders, 13.10 Breast Cancer, and 14.00 Immune System Disorders," but that there were "no objective findings sufficient to meet these Listings." Id. Regarding the severity of plaintiff's claimed mental impairments, he found that "considered singly and in combination, [it] do[es] not meet or medically equal the criteria of listings 12.04 Affective Disorders, 12.06 Anxiety-related Disorders, and 12.08

Personality Disorders." Id. He noted that he had "considered whether the 'paragraph B' criteria [were] satisfied." Id.[2]

The ALJ determined that Kaczkowski had "mild restriction" in "activities of daily living." Id. He noted that she "worked as a tutor on a daily basis, attended and studied for college level courses, both in a classroom setting and online, and could perform personal care independently, albeit with some physical difficulties." Id. He further noted that "[e]ach of the consultative examiner's reports corroborated that the claimant engaged in cooking, cleaning, laundry, and shopping." Id.

The ALJ found that Kaczkowski suffered from only "mild difficulties" in her "social functioning." Id. Specifically, he noted that she had "documented that she socializes on the phone daily and attends church regularly. In addition, the claimant alleged no problems getting along with family, friends, or other people in her Adult Function Report." Id. He noted that Kaczkowski had "informed the consultative psychological examiner that she had only one friendship and a difficult and tense relationship with her mother," despite having chronicled these other social activities. Id.

"With regard to concentration, persistence or pace," the ALJ opined that Kaczkowski

---

[2] For mental disorders, the "Paragraph B" criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. Part 404, Subpt. P, App. 1 §12.00(A). A claimant can satisfy the "Paragraph B" criteria by a showing of at least two of the following: "Marked restriction of activities of daily living"; "Marked difficulties in maintaining social functioning"; "Marked difficulties in maintaining concentration, persistence, or pace"; or "Repeated episodes of decompensation, each of extended duration." See, e.g., id. §§ 12.04(B), 12.06(B). "[M]arked" is defined as "more than moderate but less than extreme" and may arise "when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Id. § 12.00(C).

"ha[d] moderate difficulties." Id. He noted that she "reported some difficulty maintaining concentration and becoming easily overwhelmed." Id. The ALJ noted that one of the consultative psychological examiners "found evidence of impaired memory and concentration," but that "both consultative examiners noted the claimant retained the capacity to manage money and drive a motor vehicle." R. 30. One of the examiners "also documented that the claimant was currently working as a substitute teacher and taking courses to complete a college degree." Id. The ALJ wrote that Kaczkowski "has experienced no episodes of decompensation, which have been of extended duration." Id. Thus, the ALJ found that "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." Id. The ALJ also found that "the evidence fail[ed] to establish the presence of the 'paragraph C' criteria." Id.[3]

The ALJ found Kaczkowski's residual functional capacity ("RFC") to be as follows:

> [Kaczkowski] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can perform only occasional climbing of stairs, ramps, ladders, scaffolds, ropes and ladders, and occasional balancing, stooping, kneeling, crouching and crawling. In addition, the claimant can understand, remember and carry out one-to-two step tasks.

Id.

The ALJ then began an extensive review of the record. He noted that Kaczkowski presented as

> a 49-year-old woman who alleges disability based on EDS, a connective tissue disorder, as well as pain at her back, neck, bilateral shoulders, knees, wrists and

[3] Paragraph C requires that a claimant have a "complete inability to function independently outside the areas of one's home." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.06(C).

> right elbow. She also contends that she has stage 1 breast cancer, heart palpitations with caffeine, sleeping problems, recurrent headaches, and Temporomandibular joint disorder. She reports having chronic back pain stemming from degenerative disc disease in addition to problems with her hip and shoulders secondary to EDS.

R. 31. He noted the limitations Kaczkowski related in her Adult Function Report, as well as her hearing testimony that "she can carry approximately 10 pounds, but could not lift her arms overhead," and that she experienced "worsening depression, feeling overwhelmed, poor memory and concentration function, and difficulty being around other people." Id. He also recorded Kaczkowski's complaints that "she lacks motivation, is easily distracted, and has difficulty performing personal care and other activities of daily living." Id.

1. Back Injury

As to Kaczkowski's back problems, the ALJ described how the medical evidence "reveals complaints of lower back pain radiating into the claimant's right buttock and right foot since 2006, well prior to the alleged disability onset date." Id. He noted that on October 19, 2006, she had a "microlumbar discectomy with removal of extruded disc fragment compressing the nerve root at L4-5 on the left, secondary to left lumbar radiculopathy with foot drop stemming from a herniated disc at L4-5." Id. After this surgery, Kaczkowski "denied experiencing numbness, tingling or disc herniation." Id. A June 2007 "lumbar spine MRI revealed no evidence of a recurrent disc herniation," although imaging showed "'very small central L3-4 disc herniation' with no canal stenosis, a mild chronic L1 superior endplate compression fracture and mild bilateral degenerative facet hypertrophy at L3 through S1 with minimal L4-5 degenerative disc space narrowing." Id. Also, "[a]n EMG and nerve conduction study administered on April 6, 2011," after the alleged onset date, "demonstrated left peroneal neuropathy without compression at the L5 nerve root." Id.

The ALJ proceeded to review "[a]dditional imaging of the cervical and thoracic spines," which "demonstrated diffuse musculoskeletal impairments." R. 32. The ALJ characterized these impairments, revealed by post-onset date imaging, as "generally mild." Id.

> Specifically, a July 2012 cervical spine MRI showed mild multilevel degenerative changes of the cervical spine with mild left foraminal stenosis at C3-4 and C4-5 and moderate left foraminal stenosis at C5-6. This study also noted minimal disc bulging at C6-7 without significant spinal canal or foraminal compromise. A concurrent thoracic spine MRI found evidence of mild multilevel degenerative disc changes with mild paracentral disc protrusions at T3-4 and T5-6, in addition to minimal disc bulging at T2-3 and T6-7 through T8-9. These protrusions did not involve any significant spinal canal or foraminal compromise.

Id. (citation omitted). The ALJ noted that although a "lumbar spine MRI, dated September 2012, showed no evidence of recurrent disc protrusion at L4-5," the September 2012 images "did corroborate the central disc protrusion at L3-4, which was now causing concavity of the anterior margin of the thecal sac, in addition to evidence of mild spondylosis at L2-3 and L4-5." Id. Finally, the ALJ related that "a lumbar spine x-ray" taken "[t]he following year" revealed "progressive narrowing of the disc spaces at L4-5 and L5-S1." Id.

The ALJ moved on to an August 2012 statement by Dr. Hoon Park, Kaczkowski's "treating physiatrist." Id.; see also R. 497. Dr. Park's statement "limit[ed] the claimant to work a maximum of 20 hours per week on a trial basis." R. 32. Dr. Park also "suggested additional restrictions to walking up to four to six hours with breaks during an eight-hour day, sitting for one to three hours while alternating her position every 30 minutes, no repetitive work, minimal overhead reaching, and no twisting, lifting, bending, pushing or pulling." Id. "In spite of this function-by-function analysis," however, the ALJ gave "little weight . . . to Dr. Park's assessment because it is inconsistent with the overall medical evidence found during this period." Id.

The ALJ reviewed "the treatment notes of the claimant's orthopedist and neurologist between the alleged disability onset date and March 2013." Id. Records from Mid-Hudson Medical Group indicated "signs of lumbar pain with extension, decreased left great toe dorsiflexion, and reduced sensation to light touch at the claimant's left leg."[4] Id. Subsequent examinations at Mid-Hudson "were within normal limits except for evidence of diffuse tenderness at the upper back on one occasion in October 2012." Id.

The ALJ then turned to an April 2, 2012, report by "Dr. [Samant] Virk, a treating physician at Orthopedic Associates," which "reported that the claimant was just beginning to experience a recurrence of pain at her cervical spine after having pain relief from an epidural injection administered one year earlier." Id.; see also R. 507. The ALJ noted that "a nurse practitioner at Dr. Virk's orthopedic practice documented normal clinical findings during this timeframe," which "show[ed] the claimant's cervical spine impairment was not as limiting as she initially claimed." R. 32. The nurse practitioner assessed Kaczkowski with "a permanent partial moderate disability," but the ALJ gave "that opinion . . . little, if any, weight" because "records show[ed] the claimant's back pain symptoms improved with a new medication regimen implemented in March 2013, including Flexiril and a higher dosage of Gabapentin." Id.

The ALJ "recognize[d] Dr. Virk's repeated opinions that the claimant had a 50-60% disability and could not return to her past work as an x-ray technician," and that Kaczkowski suffered from "a moderate degree of disability." R. 33. The ALJ contrasted Dr. Virk's opinion

---

[4] The ALJ indicated that these records were made by "Dr. Azher." See R. 32 (citing R. 476-78). In fact, Steven B. Jacobs, D.O., made these findings. See R. 478 (record "[s]igned by Steven B Jacobs, D.O. on 01/17/2011"). Dr. Shaheda Azher and Dr. Jacobs both practiced at Mid-Hudson Medical Group. See R. 455, 478. Dr. Azher, a neurologist, composed the post-January 17, 2011 reports referenced by the ALJ. See R. 32 (citing R. 465-68, 471-75).

with the fact that "the claimant rarely demonstrated any clinical signs of dysfunction during the period under consideration" and Dr. Virk's own advice to Kaczkowski that "she could engage in low impact aerobic exercise including light ballroom dancing." Id. The ALJ "accord[ed] some weight to these opinions based on Dr. Virk's personal exams of the claimant," but gave them "little weight" because "these conclusory statements [did] not provide a function-by-function assessment of the claimant's abilities to aid in determining her residual functional capacity." Id.

The ALJ described how Kaczkowski "allege[d] thoracic and cervical pain, pain at her ribs, muscle stiffness, and parasthesias [sic] as of February 2013." Id. However, an examination by Dr. Shehada Azher, Kaczkowski's "treating neurologist, showed the claimant had full range of motion at her neck, intact sensation, normal gait, normal tandem and toe walking, and no neurological deficits." Id. The ALJ wrote that, "[d]espite the lack of significant clinical evidence, Dr. Azher diagnosed cervical and lumbar radiculopathy." Id.

The ALJ assessed a February 2013 report by Dr. Park which "found signs of tenderness and pain with movement of the claimant's lumbar spine, as well as difficulty with extension and an inability to walk for more than three feet at one time." Id. In the same report, Dr. Park "observed full muscle strength with no evidence of atrophy," but "assess[ed] a 60% partial, permanent disability." Id. Dr. Park opined that Kaczkowski's "disabling condition began as of December 4, 2012." Id. The ALJ characterized Dr. Park's February 2013 report as "vague," "expressed in workers' compensation terminology," and ultimately "not . . . persuasive." Id. The ALJ noted that "the claimant has generally had benign physical examinations, with intermittent symptoms that are not in harmony with Dr. Park's opinion of the claimant's residual functional capacity." Id.

The ALJ treated a February 2013 report by "Dr. Andrew Ng, a pain management

specialist" in a similar fashion. Id. Dr. Ng "found signs of mild tenderness at the claimant's buttocks in February 2013, but no evidence of paresthesia and no loss of sensation," as well as "a normal gait while ambulating." Id. Significantly, the ALJ noted that while Dr. Ng evaluated Kaczkowski "the month prior" and reported "limited cervical spine mobility," Dr. Ng did not repeat those findings following the February 2013 exam. Id.

Kaczkowski "continued to complain of upper and lower back pain with pain radiating to the bilateral lower extremities between late 2013 and January 2014." Id. The ALJ noted that "[p]hysical exams during this timeframe showed signs of an intermittent, antalgic gait as well as tenderness to palpation over the thoracic and lumbar spines," but "the claimant had no deficits in flexibility or muscle strength." Id. Kaczkowski's "most recent exam in January 2014," taken by her "primary orthopedist Dr. [Richard] Dentico, found mildly limited cervical spine mobility," but "testing of the bilateral shoulders revealed full range of motion and the remainder of the evaluation was unremarkable." Id.; R. 1141.

The ALJ then examined Dr. Dentico's records in detail. He had "assessed the claimant with moderate to marked disability due to her lower back injury." R. 33. The ALJ noted that as late as January 2014, Dr. Dentico "specifically opined that the claimant could lift no more than 20 pounds with any significant consistency, and must avoid all pushing, pulling, stooping and bending," and "suggested the claimant would need to alternate between sitting and standing positions every 20 minutes." R. 34. The ALJ assigned "some weight" to Dr. Dentico's opinion because of "his frequent treating history with the claimant," and noted that "the lifting limitations he proposed comport with a light exertional residual capacity." Id. The ALJ further justified the weight he gave to Dr. Dentico's opinion by noting that

> the claimant's need to change positions would be accommodated by normal work breaks in conjunction with the limitations to two hours of sitting and six hours of standing and/or walking in an eight-hour day consistent with light exertion. This is especially so given the claimant's demonstrated ability to sit while driving the approximately four miles to college and then sit through her college classes. Moreover, she testified that she could drive the 50-mile trip to visit her mother and drive to her medical appointments at the VA facility, which is approximately 22 miles each way. These activities show a greater overall functionality than alleged and contradict the claimant's testimony that she can only sit for a "few" minutes at one time.

Id.

2. Ehler-Danlos Syndrome

Next, the ALJ turned to Kaczkowski's "diagnosis of EDS." Id. He related that "treatment records establish left shoulder hypermobility since at least 2008," but Kaczkowski "did not demonstrate any significant cardiovascular related dysfunction" at that time. Id. The record includes treatment notes from David Kronn, M.D., whom the ALJ identified as "a pediatrician." Id. In early 2011, Dr. Kronn "documented hypermobility at the claimant's hips, knees, ankles and fingers" and "noted a history of shoulder dislocation and subjective reports of pain at many of the claimant's joints." Id. However, by July 2011, Dr. Kronn "considered the claimant's EDS [to be] stable." Id. The ALJ found this assessment "consistent with imaging studies from October 2013, including a bilateral hip x-ray and chest/shoulder CT scan, which revealed no significant abnormalities at these sites." Id.

The ALJ reviewed records dating from December 2013, which described Kaczkowski "exhibit[ing] hypermobility" and "report[ing] subjective complaints of occasional numbness in her left foot," but "display[ing] full range of motion and sensitivity to light touch at the bilateral lower extremities." Id. Kaczkowski was "discharged from physical therapy secondary [due] to poor attendance and from occupational therapy since she had functional range of motion and

strength despite her complaints of pain." Id. The ALJ noted that "other than occasional displays of tenderness at her bilateral shoulders with slightly reduced shoulder flexion, the claimant's physical functioning was generally intact." Id. Despite "present[ing] with bilateral shoulder laxity," she "remained fully independent in all activities of daily living" and appeared to be interested in a plan of care limited to a few follow up appointments and a home exercise program. Id.

3. Breast Cancer

The record "show[ed] evaluation and treatment of [breast cancer] in early 2012." Id. Dr. Gregory J. Zanieski, M.D., a "[s]urgical oncologist . . . discovered a mass in the claimant's right breast." R. 34-35. The ALJ noted that "an axilla biopsy" from July 2012 "confirmed malignant neoplasm of the right breast, but no metastasis." R. 35. Kaczkowski "underwent a partial mastectomy in August 2012" and "received radiation therapy" after the surgery. Id. The ALJ reported that "[m]edical records document that she was tolerating Tamoxifen treatment without complications," and "a November 2013 mammogram showed a stable right breast." Id. Consequently, it appeared that "this aggressive treatment was successful in resolving the claimant's cancer." Id. The ALJ referred to Kaczkowski's hearing testimony, where she reported "no ongoing complications from" breast cancer. Id.

Dr. Zanieski "documented that there was no evidence of recurrence of the claimant's breast cancer and no persistent residual effects from treatment as of May 2013." Id. Thus, "Dr. Zanieski opined the claimant had no current limitations to lifting, carrying, standing, walking or sitting." Id. He also reported that Kaczkowski "had not displayed any abnormal psychological behavior during her [cancer] treatment." Id. The ALJ assigned "[g]reat weight" to Dr. Zanieski's "assessment since it is consistent with the diagnostic and clinical evidence of record

related to the claimant's cancer history." Id.

4. Overall Physical Capacity

The ALJ reviewed the results of Kaczkowski's examination by consultative examiner Iftkhar Ali, M.D., in April 2013. Id. Dr. Ali "relayed the claimant's complaints of pain throughout her spine, with radiating lower back pain in addition to pain at her bilateral wrists, right elbow, bilateral knees, and right shoulder" as well as her report of "a history of breast cancer." Id. Dr. Ali "observed the claimant with a normal gait and the ability to walk on heels and toes without difficulty, perform a full squat, and complete transfers without a problem." Id. Dr. Ali "found that the claimant had full range of motion at all levels of her spine and at all joints" and that she "demonstrated full muscle strength in the upper and lower extremities, full grip strength, intact hand and finger dexterity, and no sensory deficits." Id. An X-ray from this visit was "unremarkable." Id. The ALJ related that "Dr. Ali opined that the claimant had no physical restrictions." Id. The ALJ accorded "[s]ome weight" to this opinion "since it is based on the examiner's direct observations of the claimant." Id. However, the ALJ disagreed with Dr. Ali regarding his view that she had no physical restrictions, finding that "objective medical testing of record demonstrat[ed] a reduction in [Kaczkowski's] lifting capacity." Id. "[G]iven Dr. Ali's rather positive exam findings," the ALJ found that "no further exertional restrictions are warranted," but the ALJ "included occasional postural limitations . . . to adequately address the claimant's allegations of back and joint pain." Id.

The ALJ also addressed an opinion from Dr. Carla Wiles, "a practitioner at the VA Primary Care Clinic." Id. Dr. Wiles "suggested the claimant was limited to lifting and carrying less than 10 pounds on an occasional basis and was unable to push or pull more than 10 pounds with her upper extremities," "offered restrictions in the claimant's ability to sit, stand and walk,"

"posited that the claimant could stand and walk for a total of two hours in an eight-hour workday, but for no more than a few minutes at one time," "recommended the claimant limit sitting to four hours in an eight-hour day and for no more than 50 consecutive minutes at a time," and "opined the claimant could only occasionally perform all postural activities associated with the demands of the workplace and could only occasionally reach in any direction." R. 35-36. The ALJ related that Dr. Wiles attributed these limitations to Kaczkowski's "EDS, hip bursitis, mid-back pain, and chronic pain at the rib cage." R. 36. The ALJ gave Dr. Wiles's report "little weight," finding it "not compelling since it is inconsistent with the objective clinical evidence found throughout the record and contrary to the claimant's self-described activities of daily living." Id.

5. Psychiatric Impairments

The ALJ noted that Kaczkowski "has a history of anxiety prior to the alleged disability onset date," but that she "presented as alert and fully oriented with appropriate affect" during a January 21, 2011, examination. Id.

The ALJ reviewed records from a consultative psychological examination performed in April 2013 by Alex Gindes, Ph.D. Id. Dr. Gindes

> documented the claimant's symptoms to include numerous physical pains, difficulty falling asleep, decreased appetite, feeling easily overwhelmed with increased apprehension and tension associated with panic attacks. [Kaczkowski] advised the examiner that she experienced difficulty concentrating, dysphoria, psychomotor retardation, crying spells, and episodes of irritability. In addition, despite a lack of intent or current suicidal plans, the claimant acknowledged recurrent suicidal thoughts and a remote suicide attempt by overdose at the age of 27.

Id. Nevertheless, "Dr. Gindes found the claimant cooperative with adequate social skills," although she "related in a very anxious and tense manner, and demonstrated a pressured voice,

and occasional irrelevant and tangential thought processes, in addition to an anxious and depressed affect." Id. At Dr. Gindes's examination, Kaczkowski "showed signs of impaired memory and concentration, low average intellectual functioning, and gaps in judgment." Id. Also, Dr. Gindes "assessed the claimant with mood disorder, NOS, panic disorder without agoraphobia, pain disorder associated with general medical condition, and personality disorder, NOS, with borderline features." Id. The ALJ related that "Dr. Gindes opined the claimant had no limitations following and understanding simple directions and instructions," but that Dr. Gindes had found that Kaczkowski suffered from "marked limitations in [her] ability to learn new tasks and perform complex tasks independently, with a moderate degree of impairment maintaining attention and concentration, maintaining a regular schedule, making appropriate decisions, relating adequately with others, and appropriately dealing with stress." Id. Dr. Gindes thus "concluded that depression, anxiety, and cognitive deficits might significantly interfere with the claimant's ability to function on a daily basis." Id.

However, the ALJ accorded "little weight" to Dr. Gindes's opinion "[d]espite Dr. Gindes[’s] personal examination" of Kaczkowski because his opinion was "wholly contradicted by the claimant's benign mental exams at the Veteran[’s] Affairs [facility] . . . as well as her activities of daily living, including her capacity to tutor students in calculus and attend college." Id. The ALJ noted that Dr. Gindes's opinion was inconsistent with records of plaintiff's mental health following June 2013. R. 37.

The ALJ reviewed records from a June 2013 incident when Kaczkowski "was treated at Saint Francis Hospital for what appeared to be an overdose of her prescribed medications." Id. During this hospital visit, she "presented as cooperative but with a depressed appearance, over productive speech, abnormal mood, constricted affect, and poor insight, judgment, and impulse

control," and "displayed normal thought processes, normal cognition, and intact attention and concentration skills." Id. The ALJ recorded "an attending physician['s]" opinion that Kaczkowski's "global assessment of functioning ('GAF') rating was approximately 35, which is consistent with major impairment in several areas of functioning, such as work, school, family relations, judgment, thinking or mood." Id.[5] The ALJ gave the GAF score "little weight" because it "reflect[ed] a documented episode of decompensation, yet is not indicative of the range of activities of daily living the claimant is actually able to perform on a regular and consistent basis." Id. The ALJ noted that Kaczkowski was "stabilized and discharged the following day." Id.

After her June 2013 admission to St. Francis Hospital, "an attending physician suggested

---

[5] As explained in the fourth edition of Diagnostic and Statistical Manual of Mental Disorders 25 (4th ed., text revision 2000) ("DSM-IV"), the DSM-IV utilized a "multiaxial system" that allowed for the separate assessment of different aspects of a patient's condition. Id. The axes were as follows:

| | |
|---|---|
| Axis I | Clinical Disorders [and] Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders [and] Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychological and Environmental Problems |
| Axis V | Global Assessment of Functioning |

Id. These axes and the accompanying Global Assessment of Functioning ("GAF") scale are no longer in use. See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) (stating that the latest edition of the DSM "has moved to a nonaxial documentation of diagnosis").

The GAF scale reported an individual's "psychological, social, and occupational functioning" and was viewed as "particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." DSM-IV at 30. A GAF score of 60 indicates "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." Id. at 34 (emphasis omitted). A GAF score of 35 indicates "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Id. (emphasis omitted).

the claimant was 'not employable at the time of discharge,'" but the ALJ noted that this source "failed to provide a rationale for this assessment after discharging the claimant in stable condition with a notation that she was not displaying any acute symptoms" and that the opinion stood "in stark contrast" to Kaczkowski's "generally normal mental status examinations since June 2013." Id. The ALJ explained that Kaczkowski "appeared talkative and with a dysphoric mood at times," and she was mostly "cooperative, related well with her therapists, displayed intact memory and concentration, and demonstrated average intelligence." Id. The ALJ noted two specific examples, R. 37: a "treating source [who] confirmed the claimant was pleasant, cooperative and able to follow complex commands," see R. 950, and Kaczkowski's "social worker," who "assessed the claimant with adequate coping skills as of August 2013," see R. 1044.

The ALJ further supported his assessment of Kaczkowski's mental impairments by noting that "she repeatedly presented to medical sources with normal mood and affect and no obvious signs of psychological dysfunction," which he deemed "consistent with the claimant's relatively high functioning during the majority of the period under consideration in this case." R. 37.

The ALJ "acknowledge[d] that the record contains several GAF ratings from the claimant's treating sources, generally indicating that the claimant has mild to moderate impairment in functioning," but gave those scores "limited weight" because they "reflect[ed] an assessment of functioning at the particular moment opined rather than a prognosis, and do not provide a function-by-function assessment of an individual's capacity" and thus "offer[ed] little probative value for purposes of determining . . . residual functional capacity." R. 38.

6. Overall Mental Capacity

The ALJ discussed an "assessment of the claimant's mental capacity for work-related activities" performed by Melissa Halligan, Ph.D, on February 27, 2014, approximately two months before the hearing date. R. 37. The ALJ related that "Dr. Halligan suggested the claimant was unable to meet competitive standards with regard to completing a normal workday without interruptions from psychological symptoms, or to perform at a consistent pace without an unreasonable number of breaks," and that Dr. Halligan "opine[d] that the claimant was seriously limited, although not entirely precluded, from maintaining attention for two hour segments, maintaining regular attendance, and dealing with normal work stress." Id.

The ALJ noted that Dr. Halligan had found that Kaczkowski was seriously limited, but not precluded, "in her ability to deal with the stress of semiskilled and skilled work and to understand, remember, and carry out detailed instructions." Id. The ALJ also noted that Dr. Halligan observed that Kaczkowski "could interact appropriately with the general public, satisfactorily maintain socially appropriate behavior and travel in unfamiliar places," and that Kaczkowski's "mood and overall functioning were unstable with bouts of severe depression and suicidal ideation." R. 37-38. Yet, at the same time, Dr. Halligan had found that Kaczkowski was unable to complete a normal workday without interruptions or to perform at a consistent pace without an unreasonable number and length of rest periods. Id. at 37. Further, Dr. Halligan "assessed the claimant's personality disorder as a barrier to maintain working relationships" and "concluded that the claimant was likely to be absent from work as a result of her impairments about two days per month." R. 38.

The ALJ gave Dr. Halligan's opinion "little weight," because "[r]egardless of Dr. Halligan's treating relationship with the claimant," it "conflict[ed] significantly with Dr.

Halligan's own clinical findings throughout the record," and it was "at odds with the extensive activities of daily living the claimant [was] currently performing," such as "cook[ing] for herself, go[ing] shopping, attend[ing] college level courses, and tutor[ing] other people in calculus." Id. The ALJ also described Dr. Halligan's opinion as being "internally inconsistent." Id.

The ALJ gave "[g]reat weight" to the opinion of

> the State agency psychological consultant, Dr. [M.] Marks, [who] opined that the claimant had moderate limitations in the area of concentration, persistence or pace, but no more than mild difficulty in activities of daily living and social functioning. Dr. Marks concluded that the claimant was able to understand and remember simple and somewhat complex instructions and procedures, could interact adequately to meet work related needs, and was able to cope with minor changes in routine.

R. 39; see also R. 95. The ALJ wrote that the "restriction to one-to-two step tasks" in the RFC assessment "counters the effects of workplace stress," so that he gave "less weight . . . to that portion of Dr. Mark's assessment opining that the claimant can perform some complex tasks." R. 39.

7. Credibility

The ALJ found that Kaczkowski's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 38. Kaczkowski "ha[d] described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." Id. Specifically, the ALJ referred to Kaczkowski's "admitted . . . ability to perform light household chores independently, manage money, drive and travel independently," her "being self-sufficient in personal care despite some difficulty stemming from her physical symptoms," her reports to "examining sources that she can cook, clean, shop, and do laundry," and her "riding a bicycle." Id. The ALJ found the

"[m]ost significant[]" admission was Kaczkowski's "pursu[it] [of] college level courses . . . on line . . . at Empire College and [in the] classroom . . . at Dutchess Community College." Id.

The ALJ commented that Kaczkowski's "treatment has been essentially routine and/or conservative in nature, except for [her] partial mastectomy." Id. The ALJ noted that Kaczkowski "was discharged from physical therapy in December 2013 for poor attendance." Id. The ALJ opined that "the record does not contain any non-conclusory opinions, supported by clinical or laboratory evidence, from treating or examining physicians indicating that the claimant is currently disabled." R. 39.

The ALJ reviewed Kaczkowski's earning records, which "show[ed] that while she had a generally good work history, which would normally weigh in her favor, she continued to work as a tutor during the period at issue in this case," which, "in conjunction with her broad range of daily activities, is inconsistent with the degree of impairment alleged." Id. Moreover, the ALJ "recognize[d] that the claimant had received unemployment insurance benefits for an entire year following her alleged disability onset date." Id. The ALJ noted that this "does not automatically disqualify a person from receiving disability," but "it is a factor that should be considered," since it is "inconsisten[t]" to tell "one governmental agency . . . that . . . she is 'able' to work while advising another governmental agency . . . that . . . she is 'unable' to work." Id.

Finally, the ALJ observed that "the claimant betrayed no obvious evidence of debilitating symptoms while testifying at the hearing." Id. The ALJ acknowledged that although this is not "a conclusive indicator of the claimant's overall . . . functioning," he gave this factor "slight weight . . . regarding the credibility of the claimant's allegations." Id. The ALJ specifically recalled that Kaczkowski "related well to the Administrative Law Judge, and to her representative, at the hearing and answered questions quickly and appropriately without any

evidence of a memory or concentration problem." Id.

In justifying his RFC determination, the ALJ noted that he had "taken into account the claimant's complaints of neck pain," and found that a light RFC "adequately accommodates the mild neck limitations supported by the medical record and consistent with the claimant's generally active daily activities." R. 40.

8. Ability to Perform Work in the National Economy

The ALJ found that Kaczkowski was "unable to perform any past relevant work," which he noted was "as a CT Scan and X-ray technician during the relevant 15-year period." Id. He found that "the skill level of the claimant's past relevant work exceeds her residual functional capacity for simple, one to two step tasks with only occasional decision-making." Id.

The ALJ noted that Kaczkowski "was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date," and that she had "at least a high school education and is able to communicate in English." Id. The ALJ concluded that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." Id.

The ALJ decided that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." Id. The ALJ relied on "the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2" ("Guidelines") to arrive at this conclusion. R. 41. The ALJ described how to apply the Guidelines:

> If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has non-exertional

> limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations (SSRs 83-12 and 83-14). If the claimant has solely non-exertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15).

Id. The ALJ found that the "additional limitations" in Kaczkowski's RFC "have little or no effect on the occupational base of unskilled light work," making "[a] finding of 'not disabled' . . . appropriate." Id. He noted that "stooping and bending are required only occasionally in light work, crouching is not required at all, and 'some' limitation on the ability to crawl, kneel, climb and balance would be of little significance in the broad world or [sic] work." Id. The ALJ found that because Kaczkowski "retain[ed] the capacity to carry out simple tasks," she was "able to carry out the basic mental demands of unskilled work." Id. Thus, her mental limitations did not "significant[ly] ero[de] . . . the occupational base." Id.

The ALJ concluded that Kaczkowski "ha[d] not been under a disability . . . from January 10, 2011, through the date of this decision." Id.

II. APPLICABLE LAW

A. Scope of Judicial Review Under 42 U.S.C. §§ 405(g) and 1383(c)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); id. § 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted). The Second Circuit has characterized the "substantial evidence" standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation omitted). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 448 (emphasis in original) (citation and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation marks omitted).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord id. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c). Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration

requirement," the claimant must be found disabled. Id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, in addition to his or her age, education, and work experience, permit the claimant to do other work. Id. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all of these steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

## III. DISCUSSION

### A. The "Treating Physician" Rule

Kaczkowski asserts that "[t]he ALJ erred in evaluating the medical evidence and opinions of treating examining and other sources." P. Mem. at 17; see also Reply at 2-7. The Commissioner contends that the ALJ "properly accorded 'little weight' to the opinions of Drs. Park and Wiles," D. Mem. at 26, "some weight" to Dr. Dentico's opinion, id. at 28, and "little weight" to the opinions of Drs. Halligan and Leybovich, id. at 29.

Under the "treating physician" rule," an ALJ must give "more weight to opinions" of a claimant's treating physician and certain other practitioners when determining if the claimant is disabled. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The rule directs the agency to give "controlling weight" to a treating physician's medical opinion as to the nature and severity of a

claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." Id. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion. Halloran v. Barnhart, 362 F.3d 28, 32-33 (2d Cir. 2004) (per curiam) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation marks omitted). The regulations make clear that the agency "will always give good reasons . . . for the weight [they] give [a claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Case law holds that "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal, 134 F.3d at 505).

1. Dr. Park

Kaczkowski asserts that "[t]he ALJ misapplied the test for 'controlling weight' by referring to an unspecified period at the time that Dr. Park gave his opinion and didn't evaluate the entire record, or the opinions of other sources." P. Mem. at 19. The ALJ addressed two opinions by Dr. Park: one from August 2012, R. 32, and one from February 2013, R. 33. It is unclear which of these Kaczkowski is targeting, although her reference to the ALJ's error in "referring to an unspecified period," P. Mem. at 19, indicates that it is the August 2012 opinion. Compare R. 32 (discrediting Dr. Park's August 2012 opinion because it was "inconsistent with the overall medical evidence found during this period") with R. 33 (discounting Dr. Park's February 2013 opinion for being "vague," "expressed in workers' compensation terminology," and inconsistent with Kaczkowski's "generally . . . benign physical examinations").

The ALJ gave "little weight" to Dr. Park's August 2012 opinion, which indicated that

Kaczkowski was able to work for 20 hours a week "on a trial basis." See R. 32, 497. This opinion restricted Kaczkowski to "walk[ing] 4-6 hours with breaks" and "sit[ting] for 1-3 hours alternating position[s] every 30 minutes" during "an 8 hour work day." R. 497; accord R. 32. The opinion also provided that Kaczkowski could do "no repetitive work," "minimal over head reaching, no twisting, lifting, bending, pushing or pulling." R. 497; accord R. 32. The ALJ found this opinion inconsistent with the "overall medical evidence found during this period at Exhibits 9F and 12F." R. 32. Exhibit 9F consists of records largely from Mid-Hudson Medical Group dating to between November 2005 and October 2012. See R. 367-491. They indicate, inter alia, that as of October 2012 Kaczkowski had normal neck range of motion and normal shoulder shrug, R. 467, and a normal gait, normal toe walking, "[m]ild left foraminal stenosis at C3-4 and C4-5 and moderate left foraminal stenosis at C5-6, secondary to foraminal disc osteophyte complexes," and "[m]inimal disc bulge at C6-7 without significant spinal canal or foraminal compromise." R. 468; see also R. 469-70 (mild or insignificant findings in July 2012), 471-78 (mild or insignificant findings in June 2012). Exhibit 12F consists of records from Orthopedic Associates of Dutchess County. See R. 499-567. In relevant part, these records also support the ALJ's conclusions. See, e.g., R. 505 (report of full strength and normal gait in September 2012); R. 508 (full strength in April 2012).

The ALJ also considered an opinion Dr. Park authored in February 2013. See R. 33; see also R. 492. This opinion stated that Kaczkowski suffered from a "partial[], permanent[] 60%" disability. R. 492. The ALJ found that this opinion was "not . . . persuasive" because, "[d]espite the documented clinical findings," it was "vague," "expressed in workers' compensation terminology," and inconsistent with Kaczkowski's "generally . . . benign physical examinations." R. 33. As described above, Kaczkowski does not appear to be challenging the

ALJ's determination regarding this opinion under the "treating physician rule," although she argues that the ALJ should have developed the record further regarding this opinion. See P. Mem. at 20-21. In any event, the ALJ correctly noted Kaczkowski's "generally . . . benign physical examinations" during the period under consideration. R. 33. As discussed above, Exhibits 9F and 12F feature several such benign physical examinations. These examinations provide substantial evidence supporting the ALJ's finding that Dr. Park's February 2013 opinion was unpersuasive.

The ALJ also discussed clinical findings from Dr. Azher to support his conclusion. For example, the ALJ noted that Dr. Azher's February 2013 findings "showed the claimant had full range of motion at her neck, intact sensation, normal gait, normal tandem and toe walking, and no neurological deficits." R. 33. The ALJ commented that "[d]espite the lack of significant clinical evidence, Dr. Azher diagnosed cervical and lumbar radiculopathy." Id.

Kaczkowski argues that the ALJ failed to "evaluate the entire record," P. Mem. at 19, but does not explain what other areas of the record the ALJ should have evaluated. Kaczkowski cites to three cases, without explaining how they apply to her circumstances. See id. Nor do we discern that they have any relevance. See Foxman v. Barnhart, 157 F. App'x 344, 347 (2d Cir. 2005) (summary order) (ALJ found that the treating physician's "medical opinions were well supported by medical evidence, which cannot be reconciled with a decision to accord them no weight") (emphasis in original); Norman v. Astrue, 912 F. Supp. 2d 33, 84 (S.D.N.Y. 2012) (the ALJ gave vague amounts of weight to treating physician's opinions); Correale-Engelhart v. Astrue, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010) (ALJ failed to explain reasons for rejecting treating physician's opinion).

Finally, although the ALJ did not explicitly refer to the factors in 20 C.F.R.

§ 404.1527(c)(2), this omission does not require remand. The failure to explicitly list each of these factors does not constitute legal error requiring remand where the ALJ "applied the substance of the treating physician rule." See Halloran, 362 F.3d at 31-32 (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule"). As in Halloran, our review of the record indicates that "the substance of the treating physician rule was not traversed." Id. at 32; accord Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (rejecting challenge to ALJ's "failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c)(2)" because the Second Circuit "require[s] no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear") (citation omitted); Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (no rule requiring "an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion"); Hudson v. Colvin, 2013 WL 1500199, at *10 n.25 (N.D.N.Y.) ("While [the ALJ] could have discussed the factors listed in the regulations in more detail, this does not amount to reversible error because the rationale for his decision is clear and his ultimate determination is supported by substantial evidence.") (citation omitted), adopted by 2013 WL 1499956 (N.D.N.Y. Apr. 10, 2013); Botta v. Barnhart, 475 F. Supp. 2d 174, 188 (E.D.N.Y. 2007) ("Although the ALJ should 'comprehensively' set forth the reasons for the weight assigned to a treating physician's opinion, the failure to do so does not require remand if it can be ascertained from the entire record and the ALJ's opinion that the ALJ 'applied the substance' of the treating physician rule.") (citations omitted); Mollo v. Barnhart, 305 F. Supp. 2d 252, 262 (E.D.N.Y. 2004) (finding ALJ provided good reasons to discount a treating physician's opinion where the ALJ "considered the nature of the treating relationship, the lack of any evidence in support of [the treating physician's] opinion, and the fact that his opinion was not supported by

any other medical records").

2. Dr. Wiles

Kaczkowski challenges the ALJ's decision to give "little weight" to the opinion of Dr. Carla Wiles, R. 36, arguing that "[t]he ALJ . . . failed to explain or misread the supposed inconsistencies in the medical record," P. Mem. at 17-18, failed to provide "good reasons" for discounting Wiles's opinion, id. at 18, and "failed to evaluate Dr. Wiles['s] opinion under the factors in[]20 C.F.R. 404.1527(c)(2)," id. at 19.

The ALJ gave "little weight" to Dr. Wiles's opinion because he found it "not compelling since it is inconsistent with the objective clinical evidence found throughout the record and contrary to the claimant's self-described activities of daily living." R. 36. Dr. Wiles opined that Kaczkowski had a number of significant restrictions, including that Kaczkowski could sit for a maximum of 4 hours a day, could stand for a maximum of 2 hours per day, could sit for 50 minutes at a time, and could not lift or carry more than ten pounds. See R. 1162-64.

As was true for Dr. Park, the ALJ found that Dr. Wiles's opinions were inconsistent with the objective clinical evidence and contrary to Kaczkowski's self-described activities of daily living. R. 36. The ALJ had already described the clinical evidence supporting this view at length. R. 32-33. While Dr. Wiles's notes occasionally reflect Kaczkowski's self-reports of joint, back or "rib" pain, see R. 661-64, 702, 703, 738, 750, 765-66, 832-36, there is apparently nothing in the notes that reflects any objective clinical evaluation of the source of the pain by Dr. Wiles, nor does Kaczkowski identify anything. Thus, the ALJ could properly address the weight to be assigned Dr. Wiles by analyzing the other medical evidence in the record that related to the evaluation and treatment of Kaczkowski's back pain.

3. Dr. Halligan

Kaczkowski argues that the ALJ should have given the opinions of Dr. Halligan "controlling weight," or, alternatively, should have given reasons for discounting her opinion under 20 C.F.R. § 1527(c)(2). See P. Mem. at 19-20; Reply at 5-7.

Dr. Halligan filled out a form entitled "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)." R. 1160-61. In that form, Dr. Halligan concluded that, in the area of "unskilled" work, Kaczkowski was "[u]nable to meet competitive standards" in her ability to "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms" and in her ability to "[p]erform at a consistent pace without an unreasonable number and length of rest periods." R. 1160 (capitalization omitted). Dr. Halligan noted that Kaczkowski's "functioning and mood [were] unstable," that she had "shown sustained depressed mood since May 2013," and that her "diagnosed . . . personality disorder . . . interferes with her ability to maintain working relationships." R. 1161. Dr. Halligan opined that Kaczkowski would need to be absent from work "about two days per month" because of her impairments or treatment. Id.

The ALJ gave "little weight" to Dr. Halligan's opinion. R. 38. He stated that it was "internally inconsistent," inconsistent with "Dr. Halligan's own clinical findings throughout the record," and inconsistent with Kaczkowski's reported activities of daily living. Id.

We agree with Kaczkowski that the ALJ did not sufficiently explain his reasons for discounting Dr. Halligan's opinion.

First, the ALJ described Dr. Halligan's opinion as "internally inconsistent." R. 38. The inconsistency the ALJ perceived is not clear from his opinion. It may be that the ALJ found it inconsistent that Dr. Halligan (a) found that Kaczkowski could interact with the public, maintain

socially appropriate behavior, and travel in unfamiliar places and (b) at the same time found that Kaczkowski was "[s]eriously limited, but not precluded" from understanding and remembering detailed instructions, carrying out detailed instructions, and dealing with stress. R. 1161. If such is the case, the explanation for the inconsistency is not apparent. On the other hand, it may be that the ALJ found it inconsistent that Dr. Halligan checked the box marked "[s]eriously limited, but not precluded" for the categories regarding Kaczkowski's ability to "[m]aintain attention for a two hour segment," to "[m]aintain regular attendance," and to "[d]eal with normal work stress," R. 1161, while at the same time finding that Kaczkowski could not complete a normal workday, R. 1160. Further explanation is required.[6]

Second, the ALJ found that Dr. Halligan's opinion was inconsistent with Kaczkowski's admitted daily activities of "cook[ing] for herself, go[ing] shopping, attend[ing] college level courses, and tutor[ing] other people in calculus." R. 38. On remand, the ALJ should explain more specifically how these activities were inconsistent with Dr. Halligan's conclusions. See, e.g., Blaylock v. Colvin, 2014 WL 7338936, at *3 (E.D.N.Y. Dec. 23, 2014) ("[T]he ALJ did not explain how Blaylock's ability to perform these [specified] activities undermined Dr. Ledon's opinion that Blaylock has . . . limitations and requires . . . breaks.") (citation omitted); Cortright v. Colvin, 2014 WL 4384110, at *12 (S.D.N.Y. Aug. 29, 2014) ("[A]lthough ALJ Tannenbaum correctly observed that Cortright could watch television, read, and listen to music, he did not explain how these abilities called into question the opinions of [treating physicians] . . . .").

---

[6] We note that part of the problem lies in the nature of the form Dr. Halligan completed. It is simply unclear what it means to be "[s]eriously limited, but not precluded" from maintaining attention for a two hour segment and from maintaining regular attendance. R. 1160. The form defines this limitation as "a substantial loss of ability to perform the work-related activity." Id. However, it is not clear if the person so evaluated is capable of consistently maintaining attention for a two-hour period of time.

4. Other Doctors

Kaczkowski objects to the weight the ALJ assigned to the opinions of Dr. Leybovich and Dr. Gindes.[7] P. Mem. at 19-20. Specifically, she argues that "the ALJ erred failing [sic] to give their opinions controlling weight or evaluated [sic] under 20 C.F. R. [sic] § 404.1527(c)(2)." We reject this argument.

It does not appear that Dr. Leybovich submitted a medical opinion statement.[8] And Kaczkowski does not identify the opinion of Dr. Leybovich that was allegedly improperly evaluated by the ALJ. Indeed, the ALJ never mentions Dr. Leybovich by name. The ALJ apparently gave Dr. Leybovich's GAF score "limited weight." See R. 38 (citing Dr. Leybovich's GAF score at R. 828 as one of the GAF scores given "limited weight" because they "reflect[ed] an assessment of functioning at the particular moment . . . rather than a prognosis"). Kaczkowski, however, does not identify Dr. Leybovich's GAF score as an "opinion" at issue.

Assuming arguendo that an ALJ should treat a GAF score as opinion evidence, see, e.g., Schneider v. Colvin, 2014 WL 4269083, at *4 n.5 (D. Conn. Aug. 29, 2014); Mainella v. Colvin, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014), a GAF score is merely a "snapshot opinion . . . at a specific point in time," while "[a] determination of disability must be based on the entire record." Malloy v. Astrue, 2010 WL 7865083, at *26 (D. Conn. Nov. 17, 2010).

The GAF score Dr. Leybovich generated in June 2011, which was given "limited weight"

---

[7] In her reply brief, the plaintiff contends that the ALJ improperly weighed Dr. Dentico's opinion. Reply at 2-3. Because she raised this argument for the first time in her reply brief, we do not consider it. See, e.g., Van Valkenberg ex rel. B.G. v. Astrue, 2010 WL 2400455, at *18-19 (N.D.N.Y. May 27, 2010).

[8] Dr. Halligan's report is addressed to Drs. Halligan and Leybovich. R. 1160. However, only Dr. Halligan signed it. R. 1161. The ALJ apparently considered it to be only Dr. Halligan's opinion. See R. 37-38.

by the ALJ, R. 38, was 65, R. 828. A GAF score of 65 indicates "[s]ome mild symptoms," or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." DSM-IV at 32.

Kaczkowski fails to articulate any argument explaining why the ALJ should have given more weight to Dr. Leybovich's GAF score. The ALJ identified several treatment notes which demonstrated that Kaczkowski had "generally normal mental status examinations" after June 2013 and "related well with her therapists." R. 37. These notes constitute substantial evidence which supported giving this GAF score limited weight. See, e.g., R. 969-70, 977-78, 985-86, 996-97, 1003-04.

Dr. Gindes was a consultative examiner. See 571-75. As such, his opinion is not entitled to "controlling weight" and the ALJ need not have evaluated it under 20 C.F.R. § 404.1527(c)(2). See 20 C.F.R. § 404.1527(c)(2).

B. Duty to Develop the Record

Kaczkowski contends that "[t]he ALJ erred in failing to develop or clarify [her] exertional and nonexertional impairments." P. Mem. at 20. Specifically, she refers to a note in Dr. Park's records listing an "ROM [i]ncrease from 45 to 60" as a goal for her treatment. R. 492 (internal punctuation omitted); see also P. Mem. at 20. Kaczkowski charges that because this reference was "unclear," "[t]he ALJ couldn't know whether 45° affected the ability to bend/stoop, or reach." P. Mem. at 20. Kaczkowski also claims that "there was no basis for the ALJ to determine wether [sic] or not [her] impairment in reaching was negligible, or significant." Id. at 21.

The Commissioner argues that it is "unclear how [Dr. Park's record] supports Plaintiff's argument," and that it is Kaczkowski's "burden to . . . prove disability, including furnishing

evidence thereof, and establish a more limited RFC than that determined by the ALJ." D. Mem. at 28 (citation omitted). The Commissioner notes that Kaczkowski "cites to no evidence requiring stricter stooping or reaching limitations." Id. at 29.

We agree with the Commissioner. As to the first point, Kaczkowski presents no argument or evidence as to why the note stating "ROM [i]ncrease from 45 to 60," R. 492 (internal punctuation omitted), shows that the ALJ's RFC determination was incorrect. Nor does she argue that there were gaps in her medical history. See Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citation omitted).

Kaczkowski states only that this note was "unclear." P. Mem. at 20. While there is case law suggesting that an ALJ has a duty to develop the record where there are "inconsistencies" in a treating physician's records, see Rosa, 168 F.3d at 79 (citing Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998)) (additional citations omitted); Calzada v. Astrue, 753 F. Supp. 2d 250, 278 (S.D.N.Y. 2010), such cases are best read as requiring further development of the record "only where the record was incomplete," Brown v. Comm'r of Soc. Sec., 2014 WL 783565, at *17 (S.D.N.Y. Feb. 28, 2014); accord Vanterpool v. Colvin, 2014 WL 1979925, at *16-17 (S.D.N.Y. May 15, 2014) (finding that ALJ did not have a responsibility to further develop the record where there were discrepancies between the reports and contemporaneous records of the plaintiff's treating physician). Here, there is no indication that the ALJ's decision regarding the opinion of Dr. Park resulted from incomplete treating records. The ALJ did not reject Dr. Park's opinion because of an incomplete record, but rather, as described above, because it was inconsistent with other evidence in the record.

C. Limitations on "Reaching"

Kaczkowski argues that "there was no basis for the ALJ to determine wether [sic] or not [her] impairment in reaching was negligible, or significant." P. Mem. at 21.

The Social Security Regulations define limitations in "reaching" as a nonexertional limitation. See 20 C.F.R. § 404.1569a(c)(1)(vi). "Reaching is 'required in almost all jobs,' and a reaching limitation 'may eliminate a large number of occupations a person could otherwise do.'" Selian, 708 F.3d at 422 (quoting SSR 85-15, 1985 WL 56857, at *7 (Jan. 1, 1985)). Because a reaching limitation's impact on a "claimant's ability to find work 'is not a [mere] technical or formalistic point,'" failure to rule on the severity of a claimed reaching limitation may justify remand. Id. (alteration in original) (quoting Saiz v. Barnhart, 392 F.3d 397, 400 (10th Cir. 2004)). In his RFC determination, the ALJ identified only the following physical nonexertional limitations: "the claimant can perform only occasional climbing . . . and occasional balancing, stooping, kneeling, crouching and crawling." R. 30.

The ALJ discussed Dr. Wiles's opinion that Kaczkowski "could only occasionally reach in any direction," R. 36; see also R. 1164, and Dr. Park's restriction of "minimal overhead reaching," R. 32; see also R. 497 ("allow[ing]" Kaczkowski to work in a position with "minimal overhead reaching"). As discussed above, the ALJ gave "little weight" to each of these opinions. Nonetheless, he did not mention Dr. Wiles's reaching limitation when he noted that "the occasional postural limitations incorporated in the residual functional capacity finding address the remaining limitations offered by Dr. Wiles, i.e., limited bending, squatting, extending, and flexing of the back." R. 40.

The ALJ's determination that Kaczkowski was able to perform light work, rather than sedentary work, makes his failure to assess a reaching limitation significant. See Suarez v.

Comm'r of Soc. Sec., 2009 WL 874041, at *12 (S.D.N.Y. Mar. 26, 2009) ("[A] claimant with limited reaching and lifting ability in one arm may be significantly affected in his or her ability to perform light work, but only negligibly affected in his or her ability to perform sedentary work . . . ."); cf. Sova v. Colvin, 2014 WL 4744675, at *8 (N.D.N.Y. Sept. 23, 2014) (an "ALJ's failure to specifically make a finding of whether or not the reaching limitation was 'negligible' is harmless error" where the ALJ assessed an RFC to perform sedentary work, which is "not substantially eroded where a claimant has only overhead reaching limitations, as opposed to limitations reaching in any direction"). There is some evidence in the record that Kaczkowksi suffers from limitations in her ability to reach. Her Adult Function Report stated that she could reach "only with [her] right arm." R. 218. Both Dr. Wiles, R. 1164, and Dr. Park, R. 497, suggested her reaching ability was limited. Thus, on remand, the ALJ should address this limitation (and if necessary seek further information regarding Kaczkowski's limitations in reaching).

D. Listing 1.04

Kaczkowski argues that the ALJ "erred in finding that there wasn't any objective evidence which met Listing 1.04." P. Mem. at 21. She also argues that the "medical evidence about her lumbar, cervical, tears of the labrum of her right shoulder, and her Personality Disorder, taken together might very well have equaled a Listing." Id. The Commissioner asserts that Kaczkowski has not met her burden to show that one of these listings applies to her because she "fail[ed] to cite to any evidence of record in support." D. Mem. at 25.

We agree with the Commissioner. It is the claimant's burden to prove that a listing applies, and this burden is not met where the claimant completely fails to cite to specific evidence in the record showing that they meet the listing. See Sullivan v. Zebley, 493 U.S. 521,

530 (1990) ("For a claimant to show that [an] impairment matches a listing, it must meet all of the specified medical criteria.") (emphasis omitted); see also Bertram v. Colvin, 2015 WL 4545770, at *12 (D. Vt. July 27, 2015) ("It was Bertram's burden to demonstrate that his impairments did meet or medically equal a listing, not that they 'could have' done so. Bertram fails to point to any evidence demonstrating that his combination of impairments meets or medically equals Listing 1.04 . . . ."). Kaczkowski gives no specific argument as to why her condition met listing 1.04 (or any other listing) and thus her argument is rejected.

E. Other Issues

Kaczkowski also makes other arguments challenging the ALJ's decision or reasoning — most prominently that the ALJ erroneously evaluated her credibility, see P. Mem. at 21; Reply at 8-9, that he "erred in failing to combine all effects of [her] impairments in evaluating her Residual Functional Capacity," P. Mem. at 23; Reply at 10, and that he erred in relying on the Medical Vocational Guidelines, P. Mem. at 24; Reply at 10. We do not reach these and other arguments made by plaintiff because the ALJ on remand may materially change his analysis of Kaczkowski's RFC.

Finally, we reject Kaczkowski's request for a remand to calculate benefits. P. Mem. at 25. Such remands are appropriate only where "substantial evidence on the record as a whole indicates that the Claimant is disabled and entitled to benefits." Bush v. Shalala, 94 F.3d 40, 46 (2d Cir. 1996) (citation omitted); accord Williams v. Apfel, 204 F.3d 48, 50 (2d Cir. 2000) (reversal and award of benefits proper where the "record[] provide[s] persuasive evidence of total disability that render[] any further proceedings pointless"). This is certainly not a case in which the record provides "persuasive evidence of disability." See Suarez v. Colvin, 2014 WL 5099207, at *14 (S.D.N.Y.), adopted by 2014 WL 5824538 (S.D.N.Y. Nov. 10, 2014). Thus,

remand for calculation of benefits is not warranted.

## IV. CONCLUSION

For the foregoing reasons, Kaczkowski's motion for judgment on the pleadings (Docket # 12) is granted in part and the Government's motion for judgment on the pleadings (Docket # 17) is denied. The case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. The ALJ on remand is free to further develop the record if it will assist in his decisionmaking. The Clerk is requested to enter judgment.

SO ORDERED.

Dated: October 11, 2016
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge